UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal Action No. 2: 08-76-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| DONALD E. HOWARD, | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

On the evening of March 11, 2008, Defendant Donald Howard's car was stopped in Newport, Kentucky.  After Howard consented to a search of his vehicle, a sawed-off shotgun was discovered in the trunk.  Howard was subsequently charged with violating 26 U.S.C. § 5861(d).  Howard has entered a conditional guilty plea to the weapons charge, but he has challenged the constitutionality of the stop and search leading to the discovery of the subject weapon.  The matter is currently pending for consideration of the Defendant's objections to the Magistrate Judge's Report and Recommendations concerning the motion to suppress.

Because the Court concludes that there was reasonable suspicion to conduct the stop of Howard's vehicle, and because Howard consented to the search which resulted in the discovery of the subject weapon, the Defendant's objections will be overruled and his motion to suppress will be denied.

-1-

I.      Relevant Facts

A hearing on Defendant Howard's motion to suppress was held before United States Magistrate Judge J. Gregory Wehrman on December 29, 2008.  Four witnesses testified during the hearing.  The relevant parts of their testimony are summarized below.

A.      Officer William Johnson

William Johnson is a nine and one-half year veteran with the City of Newport Police Department.  He is currently employed as a patrol officer and works the second shift (2 p.m. to 10 p.m.).  In this capacity, Officer Johnson performs random patrols and responds to calls from the Campbell County dispatch center.  Johnson testified during the December 29, 2008, hearing that, on March 11, 2008, the dispatch center had received several calls about "harassment" complaints from the area of the Victoria Square apartment complex.  He described the calls as individuals coming to the apartment complex, trying to fight with other subjects, and with guns being displayed. [Record No. 82, at 4] Several calls regarding this dispute had occurred before the start of second shift (prior to noon) and related to an earlier dispute involving two female employees at a Taco Bell restaurant located in Newport. [*Id*. at 5]

Officer Johnson responded to several of the calls originating from the Victoria Square area but could not locate any offending persons on any occasion.  He identified Officers Hood and Gallichio as others who were patrolling on March 11, 2008, and who responded to a number of the calls.  According to Johnson, the complaining caller(s) described the vehicles being driven by the offending parties as (1) gray with dark tinted windows and (2) a white [Chevrolet] Lumina. [*Id*. at 7]

In response to one of the calls, Johnson turned into the apartment complex but was stopped by a white car that appeared to be disabled.  However, the occupant was able to start the vehicle and pull it into the same parking spot.  Although Johnson did not stop this vehicle, he proceed a short distance (two car spaces) and stopped a gray car similar to the one described by the complaining caller.  The gray vehicle contained four or five occupants.  Shortly after stopping this vehicle, Officers Hood and Gallichio arrived. [*Id*. at 8]

Officer Gallichio met with the complaining party approximately a half block away.[1] From this area, Gallichio relayed information back to Officers Johnson and Hood.  Part of the information provided to Johnson included an allegation that the white vehicle that had originally blocked his entry into the apartment complex was involved in the incident.  However, he testified that this information was not known to him upon his initial arrival. [*Id*. at 8]

Officers Johnson and Hood searched the gray vehicle but did not find any weapons.[2] However, because the occupants of the white vehicle had already left the area, the officers did not attempt to search or otherwise examine the second car.  According to Officer Johnson,

> [a]s soon as I was made aware that that car [*i.e.,* the white vehicle] was involved, I turned to look and see where they went, and I caught a glimpse of one of them just going around an apartment building.  I started walking in that direction to stop them, but they were just gone at that point.  It's real easy to go into those apartment buildings. . . .  The white one, we just kind of looked around it.  We didn't go inside of it or anything.  We just made note of it.  We ran the license

---

[1]   Officer Gallichio was aware of the identity of the complaining caller. [*Id*. at 22] Further, Officer Hood had spoken with her earlier on an unrelated matter. [*Id*. at 32]  However, no specific information has been provided regarding this person's reliability, veracity and/or credibility.

[2]   There is no indication that the occupants of the two cars were feuding with each other or that occupants of both vehicles had weapons.  Therefore, the fact that weapons were not found in the gray vehicle does not indicate that the information provided by the complaining caller was incorrect.

plate.  It was an Ohio temporary license plate that was affixed to it.  We ran it, and dispatch held on to that information and put it in the run.

[*Id.* at 9-10]

The occupants of the gray car were questioned and allowed to leave the area even though the officers confirmed that they had been involved in the earlier altercation at the apartment complex.  However, because of the number of calls received that day, the officers decided to keep the vehicle under surveillance.  Officer Johnson moved his car to a nearby parking lot of a liquor store.  At approximately 9:40 p.m., a female caller to dispatch center indicated that "the guys were back and they were getting in the white car and . . . were trying to leave . . ."  The caller further indicated that the individuals getting into the white car "were the ones that had the guns." [*Id.* at 10]

Although Officer Johnson did not have a direct view of the white vehicle, Officer Gallichio did.  Gallichio radioed Officers Johnson and Hood to advise them that the car was leaving the area and that he had observed someone go from the passenger compartment of the vehicle to the trunk and back to the passenger compartment.  The white car was then stopped by Officer Hood on Fifth Street.[3]  Following the stop, Johnson pulled his vehicle behind Hood's patrol car.  [*Id.* at 12, 21]

After confirming that the driver, Defendant Howard, owned the vehicle, the officers explained the purpose of the stop.  Officer Johnson described Howard as very nice and

---

[3]     Howard stopped his car after Officer Hood activated his lights.  Guns were not drawn during the stop and the occupants were not "ordered" to exit the vehicle. [*Id.* at 18] Officer Johnson explained that the only description that the officers received before the stop of Howard's vehicle was that one subject was a black male with "dreads" and one was wearing a white tee shirt. [*Id.* at 19]

compliant. [*Id.* at 12-13] And while Officer Gallichio talked with Howard, Officer Johnson spoke with the passenger. Officer Johnson testified that,

> Eventually, we had them both just stand outside of the car. We got their IDs from them. I stepped back away from there and was running their other identification, driver's license, through our dispatch center. Officer Gallichio is talking with them, tells us, hey, they've given us verbal consent to search their vehicle. Okay. So we go and we start on that part.

[*Id.* at 13] The search performed by Officer Johnson resulted in the discovery of several live 12-gauge shotgun rounds and a sawed-off shotgun in the trunk of the car.

On cross-examination, Officer Johnson stated that, at the time of the stop of Howard's vehicle and its subsequent search, he could not verify that Howard had not violated any traffic regulations and "had [not] done anything wrong." [*Id.* at 14-15] However, with respect to the occupants of the gray vehicle, Officer Johnson testified that the only information confirmed earlier in the evening was they were "involved with part of the threatening, but they weren't the ones that were displaying the weapons." [*Id.* at 20]

## B.    Officer Jeffrey Hood

Officer Jeffrey Hood is also an experienced patrolman with the Newport Police Department. [*Id.* at 23] At the time in issue, Officer Hood was also working second shift. On March 11, 2008, Officer Hood had responded to at least two calls at the Victoria Square Apartment Complex. He described the calls as "subjects threatening the people who were calling." However, he testified that each time he responded, "everybody had fled the area . . ." When Hood responded to the second call, he testified that the complaints alleged that guns were involved. [*Id.* at 25]

-5-

While responding to one complaint, Officer Hood testified that two vehicles were identified as being involved with the suspects: a silver car and a white Chevy Lumina. And while the silver car was occupied by four persons, the white vehicle was not. After checking the occupants and searching the silver car, Hood testified that "the occupied vehicle was dispersed from the area." [*Id*. at 25] Officer Hood then established surveillance of the white car at a location approximately one block away. Shortly after establishing surveillance, Officer Hood received a call from Officer Gallichio indicating that the two occupants of the white car had returned. He testified that the white vehicle was stopped almost immediately after leaving the apartment complex. [*Id*. at 27]

Officer Hood testified that, following the stop, Officer Gaooichio obtained consent from Defendant Howard to perform a search of the vehicle.[4]  Hood stated that, as soon as he opened the driver's door, he observed one shotgun round laying on the floor on the driver's side of the vehicle. When he searched the trunk, he located three additional rounds and the shotgun concealed between the carpet and body of the vehicle. [*Id*. at 28] Officer Hood confirmed that, prior to consent being given by Howard to search the vehicle, he did not have any information to confirm that the Defendant had committed any violation or that he had any outstanding warrants. [*Id*. at 30-32]

### C.     Officer Chris Gallichio

Officer Gallichio is currently a canine handler with the Newport Police Department. He has been employed with the department since 1999. [*Id*. at 33] Gallichio testified that he

---

[4]     Officer Hood did not overhear Defendant Howard give consent for the search of the white vehicle.

responded to approximately three calls from the Victoria Square apartment complex on March

11, 2008.  In responding to the last call, Officer Gallichio stated,

> [a]t the time I pulled up, Officer Hood and Officer Johnson were out of the
> vehicle.  I walked over to the complainant, who was in the 300 block of Chestnut,
> who advised that some people in a white car and a gray car that Officer Hood and
> Officer Johnson was out with people in a gray car, had showed up, and one of
> them had a gun and displayed it and then left.

[*Id*. at 35] When Officers Hood and Johnson stopped the gray car, the complainant confirmed

to Officer Gallichio that they had stopped one of the correct vehicles. [*Id.*] And according to

Gallichio, the complainant also confirmed that the suspects involved in the altercation were black

males.

After leaving the area, Officer Gallichio established surveillance approximately 50 to 60

yards from the white vehicle.  During surveillance, Gallichio observed the interior light of the

vehicle come on.  After that light went out, he observed what appeared to be the trunk light come

on.  That light then went out and the interior light again came on.  He then advised Officers

Hood and Johnson that the vehicle was leaving the area.  Gallichio also confirmed that another

call was received from the complaining party, indicating that the suspects entering the white car

were the men that had been seen earlier with guns. [*Id*. at 36-37]

Officers Hood and Johnson initiated the traffic stop of the white vehicle.  However,

Officer Gallichio arrived shortly after the stop and spoke with the driver (Defendant Howard).

Howard complied with Officer Gallichio's request that he exit the vehicle due to the possibility

of weapons within the car.  He also testified that he asked for and obtained consent from

Defendant Howard to search the vehicle. [*Id*. at 38] No evidence was offered to contradict this testimony that Howard's consent was freely and voluntarily given.

### D.    Special Agent Michael Oergel

Defendant Howard called one witness: Michael Oergel, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives. [*Id*. at 42] Special Agent Oergel generated a report of the incident based on interviews with Officers Hood, Johnson and a third officer (Garnick).  According to the report prepared by Special Agent Oergel, Officer Johnson did not recall any "descriptors" of the suspect; however, he did recall that Howard's clothing and hair matched a description from the report given on the day of the incident (March 11, 2008).  [*Id*. at 43-44].  Special Agent Oergel confirmed that his check did not indicate that Defendant Howard had a criminal record.

### II.    Legal Analysis

Following the  hearing on the Defendant's motion to suppress, United States Magistrate J. Gregory Wehrman issued a Report and Recommendation on December 30, 2008. [Record No. 22]  After summarizing the evidence, Magistrate Judge Wehrman recommended that the Defendant's motion be denied.  The Magistrate Judge based his recommendation, in part, on the following facts:

1.    A day-long dispute occurred in the Victoria Square apartment complex on March 11, 2008, requiring numerous police runs and involving individuals who were threatening, looking for a fight, and displaying guns.

2.      The complainant was not unknown to officers and spoke to Officer Gallichio on the scene, describing two vehicles, one white and one grey.

3.      Officer Gallichio, who was in radio contact with Officers Johnson and Hood, relayed descriptions of the vehicles and confirmed that the two vehicles were the grey one officers stopped and the white one parked nearby.

4.      Officer Johnson's experience with the white vehicle was that it at first appeared to be disabled, then pulled in to a parking space; while the two officers stopped the grey vehicle, the occupants of the white vehicle left it and walked in different directions.  Officer Johnson was unable to find the one occupant he tried to follow.

5.      While no weapons were found in the grey car, Officer Hood confirmed that its occupants were involved in the ongoing altercation at the apartment complex that day.

6.      When two persons returned to the white vehicle, Officer Gallichio saw the interior light of the vehicle shine, then the trunk light, then the interior light again; he radioed that information to Officers Johnson and Hood.

7.      The complainant called dispatch to say that the persons with guns had returned to their vehicle, as well.  Dispatch related that information to the three officers conducting surveillance of the white car.

8.      Officers Johnson and Hood located and stopped Donald Howard's vehicle by engaging their lights and pulling behind him; they were joined by Officer Gallichio, who pulled behind the other two patrol cars.

9.      Officer Gallichio spoke to Donald Howard, whom he first asked to step out of the car, asking for and receiving Donald Howard's consent to search the vehicle.

[Record No. 22, at 6-7]

Finally, the Magistrate Judge concluded that the testimony of all witnesses was credible and consistent.  He did not find the need to resolve any discrepancies. [*Id*.]

The Magistrate Judge identified the sole legal issue raised by the motion to suppress as whether the three officers had the requisite reasonable suspicion under *Terry v. Ohio*, 392 U.S. 1, 22 (1968), to conduct the investigatory stop of the Defendant.  In analyzing this issue, Magistrate Judge Wehrman correctly concluded that, to determine whether reasonable suspicion exists, the Court must examine the totality of circumstances presented and decide whether the officers had a "particularized and objective basis for suspecting legal wrongdoing."  *United States v. Arvizu*, 534 U.S. 266, 273 (2002).  Further, as the Magistrate Judge correctly noted, in considering the totality of the circumstances and whether the officers acted reasonably under the circumstances, the Court must give "due weight" to the reasonable inferences the officers were "entitled to draw from the facts in light of [their] experience."  *Terry*, *supra*, at 27.[5]

While the determination of whether reasonable suspicion under *Terry* generally involves a two step analysis, the Magistrate Judge found it unnecessary to resolve the second part of the inquiry based on the Defendant's consent to search.  Instead, the focus was on whether sufficient

---

[5]      Citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989), the Magistrate Judge points out that the degree of suspicion sufficient to justify an investigatory stop is "considerably less than proof of wrongdoing by a preponderance of the evidence."  However, reasonable suspicion requires more than a mere hunch.  Officers must have a "particularized and objective basis for suspecting the person . . . of criminal activity."  *United States v. Cortez*, 449 U.S. 411, 417-18 (1981).

facts were articulated to justify the initial stop of Howard's vehicle. *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006). Citing *United States v. Marxen*, 410 F.3d 326, 330 (6th Cir. 2005), and *United States v. McCauley*, 548 F.3d 440, 441-42 (6th Cir. 2008), he recommended that the Court concluded that sufficient facts were presented under the circumstances presented. The undersigned agrees with this recommendation.

As outlined above, at the time the officer stopped the Defendant's vehicle, they had reason to believe that the occupants had been involved in threatening behavior while weapons were displayed. Further, the officers had confirmed that others involved in this activity were in the gray car that had been identified by the complaining party. And while no guns were found in the gray car, that fact does not diminish the reasonable suspicion that the guns might be contained in the white vehicle.[6] Before stopping the vehicle, another call was received indicating that the occupants of the white car were the individuals identified earlier as having guns. Further, Officer Gallichio observed conduct consistent with either removing or placing an item in the trunk of the white vehicle. Under these circumstances, a reasonable officer could conclude that there was reason to believe that criminal conduct had occurred, that one or more individuals in the vehicle were involved in criminal activity, and that evidence of the suspected criminal conduct could be found in the white vehicle.

Howard has objected to Magistrate Judge Wehrman's Report and Recommendation. [Record No. 29] Initially, he asserts that the Magistrate Judge's summary of facts does not

---

[6]     There is no indication that the occupants of the gray car were feuding with the occupants of the white car. Also, while one or more of the calls referred to "guns" as opposed to a single gun, there is no reason to conclude that the weapons were believed to be maintained in equal numbers by occupants of both vehicles.

accurately depict the dispatch scenario. [Record No. 29, at 1] More specifically, he contends that the Magistrate Judge incorrectly describes the testimony to "reveal that [more than one man was "calling people out" and "showing guns."] *Id.* He asserts, instead, that the call regarding the vehicle came in later that the calls regarding men with weapons. Based on this alleged discrepancy, he argues that the Magistrate Judge's findings improperly leads one to conclude the complainant who called about men with guns also mentioned the vehicles during the same call.

Having reviewed the transcript of the December 29, 2008, hearing, the undersigned does not believe that the Magistrate Judge's recitation of the testimony is incorrect or that it gives the wrong impression concerning the information relayed during the series of calls and complaints on March 11, 2008. Instead, the Magistrate Judge correctly focused on the information that was available to the officers immediately before they stopped Howard's vehicle.

At the time of the stop, the officers were aware of several complaint coming from the Victoria Square apartment complex. In fact, the officers had responded to these calls on several occasions. Before stopping Howard, the officers had received information that occupants of his vehicle and the gray vehicle stopped and searched minutes earlier were involved in the altercation at the apartment complex.

Likewise, the Defendant's objection to the Magistrate Judge's summary at page three (*i.e.*, that Officer Johnson did not talk to the Defendant other than to identify him) is without merit. The paragraph in question provides as follows:

> Officer Johnson identified the driver of the vehicle as Donald Howard, who was calm and compliant. However, Officer Johnson was talking to the passenger of the vehicle. Officer Gallichio, who had also arrived on the scene of the stop, talked to Donald Howard and informed Officers Johnson and Hood that Donald

> Howard had given permission to search the vehicle.  Officer Hood conducted the
> search, finding shotgun shells and a sawed-off shotgun under the carpet in the
> trunk.

[Record No. 22, at 3] Contrary to the Defendant's assertion, this portion of the Magistrate

Judge's report does not indicate that casual conversations involving the Defendant and Officer

Johnson did not occur.  Instead, the report merely highlights the *relevant* conversations that

occurred on the date in question.

Defendant Howard also contends that the Magistrate Judge incorrectly concluded that

Officer Johnson denied that the caller's information had been completely unverified.  Regarding

this issue, the Magistrate Judge's report provides:

> On cross examination, Officer Johnson conceded that he could not personally
> verify that the occupants of the white car had done anything wrong; he saw no
> driving violations or vehicle violations.  He ran the vehicle's tag and found no
> problems there, either.  When he ran the driver's license, he found no record.  The
> driver stopped the vehicle immediately and gave his license and insurance
> information.  The only description officers had received from the caller had been
> fairly general: one male black with dreadlocks and the other wearing a white tee-
> shirt.  Officer Johnson denied that the caller's information had been completely
> unverified, however; even though no guns were found in the grey car stopped
> earlier, the occupants were involved in the altercations the caller reported.  Nor
> was the caller unknown to the officers, as she has spoken to Officer Gallichio
> earlier in the day.

[Record No. 22, at 3]

Regarding the issue of whether the information provided to the officers was *completely*

unverified, Officer Johnson provided the following testimony in response to questions during

cross-examination:

> Q.    Okay.  Now, and I think the information you got that there were two vehicles, one
>       was a gray vehicle, based on this information, you and was it Officer Hood
>       stopped the gray vehicle?

-13-

A.     Yes.

Q.     And that came up noncorroborated, didn't it?  The information given, that didn't pan out as it related to that gray vehicle, correct?

A.     The information that we did corroborate are that they were the ones involved with part of the threatening, but they weren't the ones that were displaying the weapons.

Q.     Right.

A.     But they were definitely the party involved.

[Record No. 28, at 20]

Based on this testimony, it is clear that Howard's assertion regarding Officer Johnson's testimony is misplaced.  As the Magistrate Judge correctly summarized, Officer Johnson denied – and explained his basis for denying – counsel's assertion that the information the officers had received was "completely unverified."

Defendant Howard also argues that if the officers had actually believed that the occupants of the white vehicle were engaging in illegal activity with weapons, they should have merely waited near the car for the occupants to return and then ask them if they possessed weapons.  His counsel contends that following such a course of action would have been safer than allowing the suspects to drive away.  [Record No. 29, at 4]  While this assertion ignores common sense, the Court is not presented with a question of good police practices.  Instead, the focus is upon whether the officers had reasonable suspicion to stop the white Chevy Lumina driven by Defendant Howard, based upon all information known to the officers at the time of the stop.  As outlined above, the undersigned concludes that there was an objective basis to conduct the stop under the facts presented here.

-14-

Defendant Howard's challenge to the validity of the consent given to Officer Gallichio is also unavailing.  As outlined above, Officer Gallichio testified on direct examination that he requested and obtained consent from Howard (the owner and driver of the white Chevy Lumina) to conduct the search in issue.  At no point did Howard offer direct or indirect evidence that consent was not freely, knowingly, or voluntarily given.  Further, there is no evidence that Howard attempted to withdraw consent at any time during the search.  Instead, the only evidence on this point was the following testimony from Officer Gallichio:

> Q.  Did he make any statements to you?
>
> A.  No.  I had him exit the vehicle, due to the guns possibly in the car. Advised him that the reason we are stopping him.
>
> Q.  And what was his demeanor?
>
> A.  He was fine.  Very polite.
>
> Q.  Did you ask for consent from them to search the vehicle?
>
> A.  Yes, I did.
>
> Q.  Did he give you that consent?
>
> A.  Yes.

[Record No. 28, at 38]

Counsel for Defendant Howard did not challenge any part of this testimony during cross-examination.  Instead, he now contends that the Court should not accept the findings or recommendation of the Magistrate Judge on this point because the other officers present [Officers Hood and Johnson] did not testify that Officer Gallichio asked for consent or made the Defendant aware of his right to decline consent. [Record No. 29, at 6] However, there is no basis

-15-

to conclude that the consent given was not intelligently made.  Further, there is absolutely no evidence of duress or coercion in connection with Officer Gallichio's request to search the vehicle.[7]

Although the witnesses did not testify to the amount of time that passed before the Defendant's car was stopped and consent to search it was given, it would appear that this period was not lengthy.  The Defendant and other occupant of the white vehicle were asked to step out of the car due to the allegation that weapons may be present.  Logically, this is a request that would be made by the officers at the time of their initial encounter with the occupants of the vehicle.  Under the circumstances, the Court must conclude that this was a legitimate request by the officers and does not constitute an arrest.  In fact, there is no reason to infer that the Defendant was arrested or seized during the stop.

Finally, the Court disagrees with Howard's argument that he was improperly detained under the holding in *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999).  There is no basis to conclude that the investigation had been completed or had been unduly prolonged at the time Howard gave Officer Gallichio consent to search his vehicle.  Under *Terry*, no warrant was needed because consent was given to conduct the search.  Further, the stop of Howard's vehicle was appropriate because the officers had reasonable suspicion to believe that the occupants had

_____

[7]    The fact that written consent was not obtained by any of the officers for the search of the white vehicle does not alter this analysis.  Likewise, the fact that the other officers present did not hear Officer Gallichio obtain verbal consent from Defendant Howard does not affect the validity of the consent given. Simply put, other than counsel's argument, there is no basis to conclude that Howard's oral consent was not freely and voluntarily given.  Having reviewed the transcript of the December 29, 2008, suppression hearing, the undersigned has no reason to conclude that the testimony of the three officers involved in the stop of Howard's vehicle and its subsequent search is inconsistent in any material way.

engaged in illegal activity (*i.e.*, threatening others with firearms) and/or that the subject vehicle contained evidence of the alleged illegal activity.

### III.   Conclusion

Because the Newport Police Officers has reasonable suspicion to stop Defendant Donald Howard's vehicle on the evening of March 11, 2008, and because Howard gave Officer Gallichio consent to search his vehicle following the stop, it is hereby

**ORDERED** as follows:

1.   Defendant Donald Howard's motion to suppress [Record No. 13] is **DENIED**;

2.   The Report and Recommendation of United States Magistrate Judge J. Gregory Wehrman [Record No. 22] is **ADOPTED** and **INCORPORATED** herein by reference; and

3.   Defendant Donald Howard's objections to the Report and Recommendation of the Magistrate Judge [Record No. 29] are **OVERRULED**.

This 12th day of January, 2009.



Signed By:
*Danny C. Reeves*  DCR
United States District Judge